IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **SCOTT BRIAN STEFFLER**, | Civil Case No. 09-16-KI |
| Plaintiff, | |
| | OPINION AND ORDER |
| vs. | |
| **MAX WILLIAMS; GREG JONES;**<br>**SGT. RUSS; SGT. BRANCH; CPL. COONS;**<br>**CPL. PAGE; OFFICER PAGE**, | |
| Defendants. | |

      Daniel J. Rice
      Heltzel, Williams, Yandell, Roth
      Smith & Petersen, PC
      117 Commercial Street NE
      P. O. Box 1048
      Salem, Oregon 97308-1048

           Attorney for Plaintiff

Page 1 - OPINION AND ORDER

John R. Kroger
Attorney General
Andrew Hallman
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon  97301-4096

    Attorneys for Defendants

KING, Judge:

Plaintiff Scott Brian Steffler, an inmate who has been housed at several prisons within the Oregon Department of Corrections ("ODOC"), alleges three claims against several prison officials and employees.  Claim One seeks damages under the Eighth and Fourteenth Amendments for an assault by corrections officers.  Claim Two, which seeks injunctive relief, alleges a violation of Steffler's due process rights.  Because of the Prison Litigation Reform Act's exhaustion requirement, I previously limited Claim Two to the decision that Steffler would be housed in Intensive Management Unit ("IMU").  Claim Three, also seeking injunctive relief, alleges a violation of the Ninth and Fourteenth Amendments for taking money from Steffler's inmate trust account as a disciplinary sanction.  Before the court is Defendants' Motion for Summary Judgment (#71) and Plaintiff's Cross Motion for Partial Summary Judgment (#90).  For the reasons below, I conclude that the remaining portion of the Eighth Amendment claim (Claim One) concerning the assault has factual issues and must be resolved at trial; I dismiss Claim Two concerning ODOC's decision to house Steffler in IMU; and I grant Steffler partial summary judgment on Claim Three concerning a violation of his due process rights for the confiscation of money from his trust account.

**FACTS**

Since Steffler entered the custody of ODOC on July 23, 2001, he has been housed at six different facilities, moved nine times, and is currently housed in IMU at Oregon State Penitentiary ("OSP").

On July 25, 2008[1] while housed at OSP, defendant Corrections Officer Jason Page approached Steffler's cell in the general population to escort him to the Disciplinary Segregation Unit ("DSU"). According to Page, he told Steffler to back up to the cell door with his hands behind his back so that Page could apply hand restraints. When Steffler appeared to be compliant, Page opened the cell door and reached for his restraints. Steffler hit him in the face with closed fists, knocked Page to the ground, and hit Page on the back of the head about five more times. Page pushed Steffler off and delivered two blows to Steffler's face and more to Steffler's back. Five or more ODOC staff responded to the scene and restrained Steffler. They searched him, found a homemade weapon in his sock, and escorted Steffler to DSU without further incident. Fifteen minutes later, Corporal Dodge conducted a full body skin search of Steffler and saw no injuries. Page's injuries included some scrapes and a broken hand. Treatment notes from Steffler's medical records state Steffler told the Mental Health Specialists that he assaulted the officer.

Steffler gives a different version of the incident. Earlier in the day, the chaplain told Steffler that his grandfather had died, a man with whom Steffler was particularly close. Steffler denies hitting Page but concedes that he "flashed" Page, meaning that Steffler made an aggressive hostile gesture towards Page as if he might hit him. A guard down the hall announced

---

[1] Unless specified otherwise, all dates refer to 2008.

Page 3 - OPINION AND ORDER

that there was a staff assault and several guards ran into Steffler's cell. The guards cuffed Steffler without any resistance from him. Once he was cuffed, the guards slammed Steffler against the wall and repeatedly kicked and punched him in the knee, spine, head, and other parts of his body and clawed at his face and neck. Steffler states that he did not resist the officers at any point and yelled that he was not resisting when one guard called out that he was.

Inmate Poulain heard the incident and saw guards run towards Steffler's cell and place him in handcuffs. After Steffler was cuffed, Poulain saw the guards forcefully slam Steffler against the wall and hit and kick him for 30 to 60 seconds. Poulain did not see Steffler strike any of the guards or offer any resistance.

Steffler states that he suffered severe back pain, damage to his left knee joint, deep bruises and cuts throughout his body. Additionally, the tightness of the cuffs sprained his wrist and cut the skin. Steffler turned in a written request for medical treatment on July 27, two days after the incident, which asked that his injuries from the assault be properly documented and treated. Steffler listed his injuries as scratches on his face, a bashed knee, cuts from the cuffs, being kicked in the back, other cuts, bruises, and abrasions. In the response box, someone wrote "noted" and initialed the form. Steffler Aff. Ex. 1. The nurse who examined Steffler did not make any notations in his medical record.

On July 28, ODOC transferred Steffler to Oregon State Correctional Institution ("OSCI").

Steffler claims that his back pain became more severe and his movement more restricted over the two weeks after the incident.

On August 7, OSCI Health Services staff instructed Steffler on accessing health care while at the facility. He did not request medical care on that day. In response to Steffler's

Page 4 - OPINION AND ORDER

written request for medical care on August 12, a nurse examined him on August 19. Steffler reported to the nurse that he was kicked in the spine area on July 25. He did not complain of an injury to his left knee or deep bruises and cuts. The nurse assessed that Steffler suffered an alteration in comfort due to thoracic strain or spasm, post blunt trauma. The nurse gave him ibuprofen for back pain and a handout on stretches. She made a note to ask a medical provider if X-rays were indicated due to the duration of the injury. On August 20, a physician's assistant reviewed the chart but decided that no X-rays were needed at the time.

On August 27, Steffler was transferred to Two Rivers Correctional Institution ("TRCI"). He went to sick call on August 28 to complain of low back pain for the past three weeks. The next day, Steffler's lower back was X-rayed.

As part of this litigation, Dr. Hansen interpreted the X-ray to indicate that Steffler experiences chronic back pain due to a birth defect and degenerative disk disease, which Dr. Hansen characterized as a normal aging process of the spine. Neither condition is the result of blunt force trauma from the incident, according to Dr. Hansen. Steffler's back pain is currently treated with anti-inflammatory medication and stretching exercises.

Steffler was issued a Misconduct Report and had a first disciplinary hearing during which he named inmate witnesses and requested an additional investigation. The Hearings Officers continued the hearing so that the inmates and all staff members at the incident could be interviewed. On September 8, the Hearings Officer reconvened the hearing and found Steffler in violation of Assault I, Possession of a Dangerous/Deadly Weapon, and Disobedience I. The Hearings Officer sanctioned Steffler to 180 days in DSU, loss of privileges, and a $200 fine. ODOC satisfied the fine by taking the money from Steffler's inmate trust account without

Page 5 - OPINION AND ORDER

Steffler's authorization. Steffler regularly received money from family, friends, and his tribal government.

On October 22, the OSP Special Needs Inmate Evaluation Committee determined that Steffler was a "serious management concern due to serious assault on staff and possession of a dangerous weapon" and referred him to IMU. Cooney Aff. ¶ 30. Steffler asked for an administrative review of the decision, but it was upheld. Steffler served most of the DSU sanction at OSCI and TRCI. Shortly before the sanction was scheduled to end, Steffler was transferred to IMU at OSP on January 14, 2009 and transferred again to IMU at Snake River Correctional Institution ("SRCI") on January 28, 2009.

The length of an inmate's stay in IMU is determined by the number of program packets assigned by the Inmate Program Committee ("IPC"). An inmate can complete one packet every two weeks and is not eligible for release from IMU until he completes all assigned packets. The IPC assigned Steffler 39 packets, which would take a minimum of 78 weeks to complete. The IPC did not hold a hearing or give Steffler an opportunity to be heard or to present evidence prior to deciding which packets to assign him. Some of the assigned packets, such as addiction education, were unrelated to the reasons given for Steffler's IMU assignment.

Gabriell Gitnes is a Mental Health Specialist in IMU at OSP who examined Steffler. Gitnes has a Bachelor of Science in Psychology and five years of experience as a Mental Health Specialist in ODOC but is not a licensed psychologist. Mental Health Specialists, such as Gitnes, perform evaluations and treatment of inmates in IMU. A psychiatrist is stationed in IMU for medication evaluations; both psychiatrists and psychologists are provided as needed. According to Gitnes, Steffler could see a psychiatrist if he wanted to try medications for his mental illness.

Gitnes diagnosed Steffler with dysthymic disorder and antisocial personality disorder with narcissistic traits. He was treated for obsessive compulsive disorder in the past but had not complained recently to Gitnes of any symptoms of this illness. Steffler attends group sessions but is not prescribed any medication, in part because he does not want to explore medication options.

Although Gitnes believes that Steffler has chronic, but moderate, mental health issues, Steffler claims to have been diagnosed with and suffer from several serious mental health conditions, including obsessive compulsive disorder, anxiety, and impulse control disorder. He states that conditions in IMU have severely worsened his mental health problems. In IMU, the lights are left on in the cells 24 hours a day, time away from the cell is extremely restricted, there are no windows or natural lighting, loudness in the unit prevents Steffler from sleeping, there are no mental or physical activities, and there is prolonged isolation from other people. Steffler claims that the only treatment available in IMU is from unqualified nurses.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the

non-moving party and draw all reasonable inferences in favor of that party." Nicholson v. Hyannis Air Service, Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (internal quotation omitted).

**DISCUSSION**

I.      Claim One–Assault by Corrections Officers

Steffler alleges that his Eighth Amendment right[2] to be free from cruel and unusual punishment was violated when corrections officers who were removing Steffler from his cell assaulted him. Defendants seek summary judgment against the claim and rely on Steffler's statements to ODOC employees at the time to contend that Steffler assaulted Page. Defendants argue that the guards applied force in a good faith effort to restore discipline. Defendants characterize the situation as an "ordinary, garden-variety takedown of a volatile, uncooperative inmate who, on being escorted from his cell," assaulted an officer before the officer could secure the inmate's restraints. Mem. in Supp. of Defs.' Mot. for Summ. J. at 4.

Steffler maintains that there is a factual issue about whether defendants acted maliciously and unnecessarily. According to Steffler, defendants battered him after he was handcuffed and no longer a threat.

"'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" Hudson v. McMillian, 503 U.S. 1, 5, 112 S. Ct. 995 (1992) (quoting Whitley v. Albers, 475 U.S. 312 (1986)). When prison officials are accused of using excessive physical force to quell a prison disturbance in violation of the Cruel

---

[2] Steffler's complaint mentions a violation of his due process rights under the Fourteenth Amendment but he does not provide any allegation other than with respect to the physical assault. I will limit my analysis to the Eighth Amendment and grant summary judgment against any portion of Claim One which relies on the Fourteenth Amendment.

and Unusual Punishments Clause, "the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 6-7. Five factors are considered in determining if the use of force was wanton and unnecessary:

> (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response.

Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003) (citing Hudson).

The prohibition of cruel and unusual punishment "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotation omitted). The absence of serious injury is relevant to the Eighth Amendment inquiry but does not end it. Id. at 7. The Court held that Hudson's injuries–consisting of bruises, swelling, loosened teeth, and a cracked dental plate–were not de minimis for Eighth Amendment purposes. Id. at 10.

Viewing the evidence in the light most favorable to Steffler, the guards slammed him against the wall and hit and kicked him for 30 to 60 seconds, all after Steffler was cuffed and even though he did not initially strike Page and offered no resistance to the beating. This is clearly more force than required to subdue a cuffed man who is not resisting and who threatened the guard but made no physical contact. There is no evidence of efforts to temper the response, such as using voice commands to get Steffler's compliance after he flashed Page. I will discuss the extent of Steffler's injuries more thoroughly below, but he did receive medical care in the

Page 9 - OPINION AND ORDER

weeks following the incident, although he did not request care for two days. I conclude there is a factual issue on whether defendants applied force in a good-faith effort to restore discipline or maliciously to cause harm.

Defendants alternatively argue that Steffler cannot demonstrate a factual issue that he suffered more than de minimis injuries. They argue that Steffler did not request or receive medical care after the incident and did not complain of injuries when seen by health services two weeks later.

Steffler contends that he contemporaneously complained of his injuries, that the nursing staff noted them, and that in a follow-up, the nursing staff concluded that his back injuries required treatment by a doctor rather than a nurse. He claims that defendants interpret his medical record in a manner favorable to them, particularly when discussing the timing of his requests for medical treatment.

Steffler had cuts and bruises but suffered his main injury to his back. Although he did not request medical care for two days, pain from back injuries can be delayed until the muscles stiffen and the inflammation worsens. Four weeks after the incident, Steffler was still complaining of enough back pain that his back was X-rayed. Although the X-ray shows problems due to a birth defect and degenerative disk disease due to aging, there is no way to determine as a matter of law that the pain he was suffering was due to those problems. It is equally likely that either Steffler's back was injured during the incident or his prior problems were exacerbated during the incident. Steffler's medical record notes that on August 20, the physician's assistant reviewed two spinal X-rays taken of Steffler in 2007, prior to the incident. There is no record, however, of continuous complaints by Steffler of back pain before the

incident.  The medical record does document Steffler's continued complaints of back pain on January 6, 2009, April 7, 2009, May 8, 2009, and May 19, 2009, ten months after the incident.

I cannot conclude as a matter of law that Steffler suffered only de minimis injuries.  The inmate in <u>Hudson</u> suffered bruises, swelling, loosened teeth, and a cracked dental plate, which the Court concluded were not de minimis injuries.  <u>Hudson</u>, 503 U.S. at 10.  Steffler's injuries are of the same order of magnitude.  Thus, there is a factual issue on whether Steffler's injuries are sufficient to support an Eighth Amendment claim.

Defendants also ask me to dismiss this claim because they are shielded by qualified immunity.

To determine whether a government employee is entitled to qualified immunity, the court uses a two-part test:  (1) the court "must determine whether, viewed in the light most favorable to the plaintiff, the government employee violated the plaintiff's constitutional rights"; and (2) the court "must also determine whether the rights were clearly established at the time of the violation."  <u>Friedman v. Boucher</u>, 580 F.3d 847, 852 (9th Cir. 2009).  The court may use its discretion to decide which of the two prongs should be addressed first.  <u>Pearson v. Callahan</u>, __ U.S. __, 129 S. Ct. 808, 818 (2009).

Based on the analysis above, defendants are not entitled to qualified immunity as a matter of law.  Steffler has raised a factual issue on whether defendants violated his constitutional rights.  Moreover, the law was clearly established when <u>Hudson</u> was decided in 1992.  Accordingly, I deny defendants' motion for summary judgment against the Eighth Amendment claim.

II.     Claim Two–Placement in IMU

Steffler alleges that the arbitrary decision to house him in IMU violated his due process rights because prison officials did not consider his mental illnesses when making the decision. Defendants seek summary judgment against the claim, arguing that Steffler has no liberty interest in avoiding IMU placement. According to defendants, IMU does not impose significant hardships beyond what is ordinary for prison life.

Steffler argues that the severity of his mental illnesses creates a factual issue on whether he has a liberty interest in avoiding IMU placement. He claims that defendants base their argument on a diagnosis provided by an ODOC employee who lacks the qualifications to diagnose mental illnesses.

In reply, defendants contend that inmates in IMU have appropriate access to mental health services based on their needs. Defendants argue that Steffler is receiving mental health treatment in IMU, that his mental health issues are chronic but moderate, and that his symptoms are improving.

Because Steffler did not exhaust all portions of the claim, I previously limited Claim Two to the decision that he would be housed in IMU. The claim concerns neither the conditions of confinement in IMU nor any failure to provide appropriate mental health care during Steffler's confinement in IMU.

Procedural due process requirements only apply to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. Board of Regents v. Roth, 408 U.S. 564, 569, 92 S. Ct. 2701 (1972). Liberty interests are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation

Page 12 - OPINION AND ORDER

to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293 (1995).

The court considers three factors in determining whether a prison hardship is atypical and significant: "(1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; (2) the duration of the condition, and the degree of restraint imposed; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence." Serrano v. Francis, 345 F.3d 1071, 1078 (9th Cir. 2003) (quoting Sandin, 515 U.S. at 486-87), cert. denied, 543 U.S. 825 (2004). Assignment to administrative segregation, without other factors, does not implicate a protected liberty interest. Id.

Steffler's argument is quite similar to the facts discussed in Serrano, in which the inmate was confined to a wheelchair. Serrano was charged with battering a prison staff member and immediately placed in administrative segregation in the Special Housing Unit ("SHU"):

> Serrano wallowed in a non-handicapped-accessible SHU for nearly two months–25 days of which immediately followed Francis' sentencing Serrano to a year-long term in the SHU. During his time in the facility, Serrano was denied use of his wheelchair, which he was permitted to use in the general population. Serrano has alleged that he could not take a proper shower; that he could not use the toilet without hoisting himself up by the seat; that he had to crawl into bed by his arms; that he could not partake in outdoor exercise in the yard; and that he was forced to drag himself around a vermin and cockroach-infested floor.

Id. The court reasoned that the confiscation of Serrano's wheelchair "dropped him from the relative baseline status that he maintained outside administrative segregation and forced him to endure a situation far worse than a non-disabled prisoner sent to the SHU would have to face."

Page 13 - OPINION AND ORDER

Id. at 1079. The court held that Serrano had a protected liberty interest in being free from confinement in a non-handicapped-accessible administrative housing unit. Id.

I will assume that Steffler suffers from all mental illnesses with which he has ever been diagnosed: obsessive compulsive disorder, anxiety, impulse control disorder, dysthymic disorder, and antisocial personality disorder with narcissistic traits. The diagnoses are not dispositive, however, because the effect of the illnesses on individuals varies greatly.

Steffler claims that conditions in IMU have severely worsened his mental health problems. His medical record indicates that he attends group therapy sessions and occasionally meets with a Mental Health Specialist. Steffler, however, has not worsened to the extent that he has been hospitalized. He has not attempted suicide. He is not taking any medication for his mental illnesses. Steffler's situation is far less dire than Serrano's, who could not properly shower, use the toilet, get into bed, or exercise outside, and who had to crawl around on a vermin-infested floor.

Even though assignment to IMU with Steffler's disability may have worsened his mental health, Steffler has not raised a factual issue that it has done so to a degree that makes the IMU assignment an atypical and significant hardship in relation to the ordinary incidents of prison life. Consequently, Steffler has not shown that he has a protected liberty interest. I grant summary judgment against the due process claim concerning IMU.

///

///

Page 14 - OPINION AND ORDER

III.     Claim Three–Monetary Sanctions

Steffler alleges that his due process rights[3] were violated when defendants took $200 from his trust account to satisfy a fine imposed for disciplinary purposes. He originally pleaded that the source of the money–gifts from friends and family–was relevant but he has now dropped that argument. Steffler seeks a partial summary judgment ruling that defendants violated his due process rights, arguing that defendants do not have the statutory authority to collect fines directly from his trust account. According to Steffler, administrative regulations or formal internal agency policy are insufficient support for the forfeiture. He contends that without underlying statutory authority, no amount of process prevents a due process violation.

Defendants seek summary judgment against the claim, arguing that the Oregon Court of Appeals twice concluded that Oregon's statutory scheme grants ODOC authority to impose such fines. Steffler distinguishes the cases because they discuss the imposition of fines rather than the collection of fines directly from inmate trust accounts.

An inmate has a protected property interest in the funds in his prison trust account. Quick v. Jones, 754 F.2d 1521, 1523 (9th Cir. 1985) (Washington prison officials violated inmate's due process rights by taking money from his prison trust account to satisfy a restitution order put in place by a disciplinary committee who found that the inmate violated his furlough but did not make a finding that the inmate caused the property damage).

---

[3] Steffler's complaint also alleges that defendants violated his rights under the Ninth Amendment ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."). Steffler does not state a specific right at issue, other than his due process rights. The Ninth Amendment does not independently secure a constitutional right for purposes of pursuing a civil rights claim. Strandberg v. City of Helena, 791 F.2d 744, 748 (9th Cir. 1986). Thus, I grant summary judgment against any claim under the Ninth Amendment.

Page 15 - OPINION AND ORDER

Steffler relies on Vance v. Barrett, 345 F.3d 1083, 1090-91 (9th Cir. 2003), in which the court held that Nevada Department of Prisons' ("NDOP") practice of confiscating accrued interest from prisoners' trust accounts violated the prisoners' due process rights. Nevada statutes provide that interest earned is credited to the fund after applicable charges are deducted. Id. at 1086. The court reasoned:

> Without underlying authority and competent procedural protections, NDOP could not have constitutionally confiscated the net accrued interest. See Tellis [v. Godinez], 5 F.3d at 1317; Quick v. Jones, 754 F.2d 1521, 1523 (9th Cir.1985) (citing Sell v. Parratt, 548 F.2d 753, 759 (8th Cir.1977) ("An administrative agency [i.e., the Department of Correctional Services] has no right without underlying statutory authority to prescribe and enforce forfeitures of property ... when an agency does so, it violates the due process clause of the fourteenth amendment.")); cf. Halverson v. Skagit County, 42 F.3d 1257, 1260 (9th Cir.1994) ("When the action complained of is legislative in nature, due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law." (quotation marks and citation omitted)). It is therefore clear that Vance had a valid due process right in jeopardy.

Id. at 1090-91 (footnote omitted).

Defendants rely on Clark v. Schumacher, 103 Or. App. 1, 795 P.2d 1093 (1990), a judicial review of ODOC administrative rules allowing the imposition of fines as disciplinary sanctions for misconduct. Id. at 3. Clark held that the general policy of ODOC's statutory framework permitted the imposition of fines as disciplinary sanctions. Clark relied on ORS 421.105(1), which allows the superintendent to enforce institution rules with appropriate punishment that does not amount to cruel and unusual punishment. The court determined that appropriate punishment encompassed the authority to impose disciplinary fines. Id. at 5-6. Clark does not address the collection of fines from inmate trust accounts.

Defendants also rely on Barrett v. Dept. of Corrections, 203 Or. App. 196, 125 P.3d 98 (2005), a judicial review of other ODOC administrative rules concerning the imposition of fines. Id. at 198.  Barrett addressed whether ORS 421.125 contains a statutory limitation on sanctions for rule violations that otherwise would be authorized by ORS 421.105.  ORS 421.125 states in relevant part:

> It is the responsibility of every inmate of the Department of Corrections, during the inmate's term of imprisonment, to accumulate funds in anticipation of parole, discharge or other authorized prerelease and for the purposes set out in this subsection.  The Department of Corrections shall adopt rules to:
>
> (a) Safeguard inmate moneys, whether such moneys are from earnings of the inmate while in a Department of Corrections facility, or from other sources, and to provide for disbursement of such moneys to the inmate following the inmate's release from imprisonment;
>
> . . . .
>
> (e) Assess the inmate for damages or destruction caused by willful misconduct of the inmate.

ORS 421.125(2).  The court held that this statute's use of the word "damages" concerns reparation or restitution, as distinguished from a "fine" which is a monetary penalty imposed for infraction of a rule or obligation.  Barrett, 203 Or. App. at 200.  The court thus concluded that ORS 421.125(2) does not pertain to fines.  Id.  The court determined that the rule at issue was authorized by ORS 421.068(1):

> Revenue from certain sources to be used to enhance inmate activities and programs.
>
> (1) Revenues, less operating expenses, from the following sources shall be deposited into an account established by the Department of Corrections to provide money to enhance inmate activities and programs including education programs:
>
> (a) Operation of correctional institution canteens;

Page 17 - OPINION AND ORDER

>    (b) [vending machines];
>
>    (c) [telephones];
>
>    (d) Funds confiscated from the inmates under existing disciplinary procedures; and
>
>    (e) Funds donated under administrative rules promulgated by the Director of the Department of Corrections.
>
> Barrett concludes:
>
>    Thus, that statute explicitly contemplates that "funds may be confiscated from inmates pursuant to "disciplinary procedures."
>
>    In sum, we conclude that nothing in ORS 421.125 calls into question our conclusion in Clark that ORS 421.105(1), which authorizes DOC to enforce obedience to institutional rules, "by appropriate punishment," authorizes the imposition of fines for inmate misconduct.
>
> OAR 291-105-0010(15) and OAR 291-105-0066(5), (6), and (9)(d) held valid.

Barrett, 203 Or. App. at 200-01. Clark and Barrett both concern the *imposition* of fines and not the *collection* of fines from inmate trust accounts. Thus, I find the statement from Barrett–that funds may be confiscated–to be dicta.

I also find the statement to be unpersuasive because there appears to be a hole in the statutory scheme. ORS 421.068(1)(d) provides guidelines for spending funds received from numerous sources. It assumes that funds will be confiscated under disciplinary procedures but does not actually provide any authority for the confiscation because the point of the statute is how money is to be spent. ORS 421.105 generally addresses the enforcement of rules but says nothing expressly about either the imposition of fines or the confiscation of funds from trust accounts. ORS 421.125 concerns money the inmate is to save during incarceration which the inmate can take when released. It also allows ODOC to assess the inmate for "damages or

Page 18 - OPINION AND ORDER

destruction caused by willful misconduct." ORS 421.125(2)(e). As noted in Barrett, however, damages are different from a fine. There is no statute which provides the authorization for ODOC to confiscate funds from an inmate trust account to satisfy a fine imposed during a disciplinary hearing. Moreover, ORS 421.125(2)(e) provides for the *assessment* of damages, which again is different from the *collection* of the money.

For these reasons, I conclude that defendants[4] violated Steffler's due process rights when they took $200 from his trust account to satisfy a fine imposed for disciplinary purposes.

Additionally, defendants are not protected from liability by qualified immunity. Vance was decided in 2003; Quick was decided in 1985. Barrett and Clark do not discuss the collection of fines from trust accounts. The law was clearly established at the time of the violation in 2008. Thus, I grant Steffler's motion for partial summary of liability on Claim Three and deny defendants' motion.

## CONCLUSION

Defendants' Motion for Summary Judgment (#71) is granted in part. Plaintiff's Cross Motion for Partial Summary Judgment (#90) is granted.

IT IS SO ORDERED.

Dated this ___9th___ day of June, 2010.

                                                /s/ Garr M. King
                                                Garr M. King
                                                United States District Judge

---

[4] We will have to sort out which defendants are liable at trial. Defendants did not argue that certain of them had nothing to do with this conduct, although I assume that is the case.

Page 19 - OPINION AND ORDER